CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF OREGON
OCT 0 6 2004
LODGED_____REC'D_____
PAID_____DOCKETED_____

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re: ) Bankruptcy Case No.
) 04-60389-fra13
RICHARD T. OGDEN and )
JOYCE M. OGDEN, )
) MEMORANDUM OPINION
Debtors. )

After a long and confusing financial ride, Debtors now seek refuge in Chapter 13. For the reasons set out in this opinion, confirmation of the Debtors' proposed plan will be denied; however, the Court will not, for now, foreclose any possibility of reorganization.

I. PROCEDURAL ISSUES

The Debtors' proposed plan was filed on February 3, 2004 (Doc. No. 11). The confirmation hearing was conducted, after several postponements, on September 15, 2004. Objections to confirmation have been filed by the Internal Revenue Service (Doc. No. 12), Oregon Department of Revenue (Doc. No. 14), creditors Gloria and Robert Jakobitz (Doc. No. 18), and the Trustee (Doc. No. 45). The Trustee's objection includes a motion to dismiss the case.

PAGE 1 - MEMORANDUM OPINION

Mr. and Mrs. Jakobitz allege that Debtors are indebted to them because of events surrounding the sale of the Jakobitzes' business to a trust controlled by the Debtors. They have not filed a proof of claim. The Debtors assert that the Jakobitzes lack standing to object to confirmation because of their failure to file a proof of claim. They rely on In re Stewart, 46 B.R. 73 (Bankr. D.Or. 1985) (Hess, C.J.). In that case the Court held that an objecting creditor was not a "party in interest" because it had not filed a proof of claim. Since the creditor was not a party in interest, it had no standing to object to confirmation.

Code § 1324 provides that:

> After notice, the court shall hold a hearing on confirmation of the plan. A party in interest may object to confirmation of the plan.

The term "party in interest" is not defined in the Code. Case law has characterized a "party in interest" as anyone with a stake in the outcome of the case. See Davis v. Mather (In re Davis), 239 B.R. 573 (BAP 10th Cir. 1999)(party in interest includes those whose pecuniary interests are directly affected by the bankruptcy proceedings as well as those who have an interest in the property to be administered and distributed under the Chapter 13 plan); In re Amatex Corp., 755 F.2d 1034, 1041-44 (3d Cir. 1985)(anyone who has a practical stake in the outcome of a case); In re Johns-Manville Corp., 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984)(anyone who will be impacted in any significant way in the case). It is not clear that the interest has to be economic, or that the allowance or payment of a claim is the only basis for an "interest." A person may, for

PAGE 2 - MEMORANDUM OPINION

example, have an interest in the outcome of a Chapter 13 confirmation because the discharge in Chapter 13 is more extensive than that allowed in Chapter 7. § 1328. This is precisely why the Jakobitzes are objecting: they believe that Debtors' liability to them may be discharged in a Chapter 13 case, but will not be under Chapter 7.

In my view, the Jakobitzes are "parties in interest," and have standing to object to Debtors' efforts to discharge any debt they may have to the Jakobitzes. Had Congress intended that the right to object be limited to creditors, or holders of claims (each of which is defined), it would have said so. Since it did not, it stands to reason that the right to object under § 1324 is not limited to those who have filed a proof of claim.

## II.  BACKGROUND

A.  Debtors' Family Trusts

The principal feature of the Debtors' financial life is the creation of a series of trusts and limited liability corporations. The trusts were created with the advice and assistance of a company known as National Trust Services. The Debtors' intention in creating the trusts was to "avoid liability." In theory, the Debtors avoid personal liability respecting their business and personal transactions by conducting their financial life through a series of supposedly independent trusts. Of course, another way to characterize the arrangement is to say that the effect of the trusts is to put the Debtors' assets beyond the reach of their creditors.

At the center of the scheme is the Ogden Family Trust. Satellite trusts and LLCs include Oak Den (a pun on Ogden?) LLC, the Ogden Family Freedom Trust, said to be a charitable trust, Timberline Telecom LLC, the "Mom's Bus" Trust, and a number of other entities. The central trust was originally funded from the proceeds of the sale of the Debtors' home in California. There ensued a series of inter-trust transfers, including:

- Real property was transferred to the Southern Oregon Trust, controlled by the Debtors' parents. While the property originally belonged to the Debtors, or their trust, they are now paying rent to the parents' trust.

- The family trust transferred cash to the Freedom (charitable) Trust, which then purchased a van for the benefit of the Mom's Bus Trust. Mom's Bus was dissolved and the vehicle returned to the charitable trust, which in turn transferred it to another charitable trust controlled by a neighbor in Josephine County. The Debtors agreed to make monthly payments to the neighbor's charitable trust to pay for the van.

- One or more of the family trusts have made a substantial contribution to the legal fees owed personally by the Debtors.

B. Jakobitz Litigation

In April 1999, the Debtors negotiated the purchase from Mr. and Mrs. Jakobitz of the Jakobitzes' shares in ECI, a local telecommunications company. The purchaser was Oak Den Ventures, a

trust created by the Debtors.[1]  The contract of sale provided that
the Oak Den Trust would, for approximately $590,000, buy all of
Jakobitzes' shares in ECI Communications, Inc.  In addition, the
purchaser undertook to pay lines of credit owed to Wells Fargo Bank
and American Express, which lines were owed by the corporation and
guaranteed by the Jakobitzes.  To secure payment, the sellers
"retained" a security in ECI's receivables until the amount due to
them was paid in full.  However, ECI does not appear to be a party
to the agreement, and there is no evidence in this record that ECI
itself granted a security interest in any assets.  Likewise, there
is no evidence of any action to perfect the security interest,
whatever it may actually have been.

Two other aspects of the transaction are worth noting: first,
there was clear and unmistakable disclosure to the Jakobitzes that
they were dealing with a trust, and not with the Debtors
individually.  Second, and related to the first: there is no
provision for any personal guarantee of any obligation to Jakobitz
by the Debtors.

Debtors' testimony at the confirmation hearing was that ECI
had been losing substantial amounts of money every month, and that
they were unable to turn it around.  Jakobitz maintained that the
real value of the company lay in the fact that it possessed a number

---

[1] Strictly speaking, the Oak Den Ventures Trust was created by the Ogden Family Trust.  Such niceties aside, all of the trusts and corporations involved were clearly under the control of the Debtors.

PAGE 5 - MEMORANDUM OPINION

of accounts, which gave it value to larger telecommunication companies which were in the process of buying up smaller ones.

After the sale closed, Oak Den's trustees (in other words – the Debtors) caused ECI to transfer its receivables to a separate company controlled by the Debtors or their trusts. This company collected ECI's income, while ECI defaulted on its obligations to Wells Fargo, forcing a sale of ECI's assets that were collateral. Eventually, the collateral was transferred to yet another Debtor-controlled entity.

Jakobitz eventually sued the various Debtor-controlled entities, and obtained judgments finding the transfers to be fraudulent. There was, at the time this case was commenced, an action against the Debtors personally in the District Court for this district.

After the collapse of the telephone venture, Mr. Ogden obtained employment from a company called Silver Cache. Silver Cache is owned and operated by the Ogdens' son-in-law. Its capitalization and source of funds remain something of a mystery on this record. The company reported gross sales of between $175,000 and $220,000 for its fiscal year of 2002-2003. However, it reported zero dollars in taxable income on its last returns.

Mr. Ogden is, essentially, a salesman for the company. He is to paid $2,600 per month. Payment is presently being made directly to him as what he characterizes a "W-2 employee." Previously, Mr. Ogden was paid by Ogden and Associates, LLC, which received payment from Silver Cache on account of Ogden's activities.

PAGE 6 - MEMORANDUM OPINION

Case 04-60389-fra13    Doc 67    Filed 10/06/04

III. ANALYSIS

A. Good Faith

In order to confirm a plan of reorganization, the Court must find that "the plan has been proposed in good faith and not by any means forbidden by law;" Code § 1325(a)(3). This section requires more than an absence of illegality or malice.

> [T]he proper inquiry is whether the [debtor] acted equitably in proposing [his] Chapter 13 plan. A bankruptcy court must inquire whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner. . . . [T]he court must make its good-faith determination in the light of all militating factors.

In re Goeb, 675 F.2d 1386, 1390 (9th Cir. 1982). A debtor's good faith should be determined on a case-by-case basis. Id.

It has been questioned whether a plan may be said to be in good faith if the debtor has liabilities that may be excluded from discharge in a Chapter 7 case, and the proposed plan is indistinguishable from a Chapter 7 in its financial effect. See In re Warren, 89 B.R. 87 (BAP 9th Cir. 1988); In re Le Maire, 898 F.2d 1346 (8th Cir. 1990). The Debtors' case is indeed indistinguishable from a Chapter 7. They propose to pay $100 a month for 36 months, resulting in an estimated 1% dividend to general unsecured creditors, and to retain their vehicle and other personal property.

If a debtor is devoting his or her entire disposable income to plan payments, however, the fact that the plan results in a low percentage repayment to unsecured creditors is not relevant in determining good faith. State of Oregon v. Seldon (In re Seldon),

PAGE 7 - MEMORANDUM OPINION

121 B.R. 59, 62 (D.Or. 1990). Moreover, the mere fact that a chapter 13 plan proposes to discharge debts otherwise nondischargeable under chapter 7 is not sufficient in itself to prevent confirmation, Id, but is another factor the court may weigh in its good faith analysis.

The Jakobitzes assert that the Debtors' liability to them would be excepted from discharge in a Chapter 7 case under Code § 523(a)(2), (4) or (6). It is not clear on the record before the Court that this would necessarily be the case. There is no doubt that the Jakobitzes were mistreated by the Ogdens. However, it must also be said that the transaction was not structured in a way to give them much protection. There was no personal guarantee to ensure the Ogdens were ultimately responsible for payment. The fact that the Ogdens may have made it clear that they would not give a guarantee does not relieve the Jakobitzes of the obligation to insist on one if they want that sort of protection. It appears also that ECI itself did not give a security interest in any of its assets. In short, the Jakobitzes' dischargeability claims are problematical.

This is not to say that discharge in Chapter 7 would be a sure thing. There is considerable reason to believe that the Debtors cannot fully account for their financial history prior to their bankruptcy. It is also apparent that there were several transfers, including those that actually created the trusts, that were intended to hinder or delay creditors. If that is the case, discharge in Chapter 7 might be denied under Code § 727.

PAGE 8 - MEMORANDUM OPINION

Finally, careful consideration should be given to the general prepetition history, which discloses a pattern of activity designed to thwart the interest of creditors. That these activities may continue is demonstrated by the fact that the Debtors have failed to wind up and liquidate their various trusts and other independent entities as part of their reorganization. Given the totality of these circumstances, the Court concludes that the Debtors' plan has not been proposed in good faith, and should not be confirmed.

B. Best Interest

The plan must provide for payment, over its lifetime, of an amount at least equal to what would be paid to creditors in Chapter 7. § 1325(a)(4). This plan fails to do so.

The family car, which is provided for in paragraph 4 of the plan, was originally purchased for cash, with the money subject to the Debtors' control. They have now, through a series of transactions, transformed the arrangement so that they are making monthly payments to an entity that purports to hold the security interest. The transaction is a sham. There is no evidence that payments are actually being made, or that the purported secured creditor intends to enforce the agreement. What the transaction does accomplish is remove the value of the van from the best interest test, reducing the amount to be paid to creditors by the nonexempt value of the van.

Likewise, the record does not reflect adequate consideration for the transfer of the Debtors' real property to a trust controlled by their parents. The value of the estate's interest in claims it

Case 04-60389-fra13    Doc 67    Filed 10/06/04

or the Debtors may have against the transferees on account of these transfers must be included in the amount to be paid to creditors. Debtors argue that, to the extent there are fraudulent transfers, they can be recovered by the Trustee. Assuming this to be true, the Debtors themselves are not relieved of the requirement that the plan provide for payment to creditors of the value represented by those fraudulent transfer claims.

C. Feasibility

The Code requires that a plan be feasible. In addition, all priority claims, including those owed to taxing authorities, must be paid in full. There is evidence that a considerable sum of money was transferred from one or more trust entities to an attorney representing the Debtors individually. This is likely to be taxable income to the Debtors. 26 U.S.C. § 61. However, no provision is made in the plan for such tax liability.

V. CONCLUSION

For the reasons stated herein, confirmation of the Debtors' plan of reorganization must be denied. The Court is not prepared to foreclose the possibility of reorganization altogether, and will therefore order that the Debtors, if they elect to do so, shall

// // //
// // //
// // //
// // //
// // //

PAGE 10 - MEMORANDUM OPINION

submit a modified plan within 45 days of the date of the order accompanying this opinion. Should they decline to do so, or if the plan they submit cannot be confirmed, the case will be dismissed unless the Debtors elect to convert the case to one under Chapter 7.

FRANK R. ALLEY, III
Bankruptcy Judge

PAGE 11 - MEMORANDUM OPINION